IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | |
|---|---|
| C.C., a minor, by and through her Parents and Next Friends, LEIGHARA COOPER and TRAVIS COOPER, et al.<br><br>    Plaintiffs<br><br>v.<br><br>UNIVERSITY OF MARYLAND CHARLES REGIONAL HEALTH, INC. d/b/a UNIVERSITY OF MARYLAND CHARLES REGIONAL MEDICAL CENTER, et al.<br><br>    Defendants | *<br>*<br>*<br>*<br>*  Civil Action No. 8:18-cv-03891GLS<br>*<br>*<br>*<br>* |

\* \* \* \* \* \* \* \* \* \* \* \* \*

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF *OMNIBUS* MOTION *IN LIMINE***

    The Plaintiffs, C.C., a minor by and through her Parents and Next Friends, Leighara Cooper and Travis Cooper, Leighara Cooper, Individually, and Travis Cooper, Individually, by and through their undersigned counsel, hereby file this *Omnibus* Motion *In Limine*. In support thereof, the Plaintiffs submit the following Memorandum.

    **I.    FACTUAL BACKGROUND AND PROCEDURAL POSTURE**

    On July 7, 2014, following months of an uncomplicated pregnancy, the Plaintiff Leighara Cooper presented to University of Maryland Charles Regional Medical Center at approximately 4:00 p.m. for induction of labor. *See* Compl. at ¶11. She was forty-one (41) weeks pregnant at that time. *Id.* at ¶12. The healthcare providers hooked Mrs. Cooper up to an electronic fetal monitor at approximately 4:15 p.m. to monitor fetal oxygenation and fetal well-being during the induction and labor. *Id.* at ¶13. At approximately 4:45 p.m., Erica Contreras, M.D., performed a history and physical examination, wherein she described Mrs. Cooper's pregnancy as being "uncomplicated." *Id.* at ¶14. Initial fetal heart monitoring was reassuring and remained so for

1

more than twenty-three (23) hours. *Id.* at ¶¶15-17. Cervidil was then placed for cervical ripening and Mrs. Cooper was left to allow her cervix to dilate over the next several hours. *Id.* at ¶17.

On July 8, 2014, at 7:30 a.m., Dr. Contreras artificially ruptured Ms. Cooper's membranes and the fluid was noted to have "light meconium" – meconium stained amniotic fluid results from the fetus passing stool *in utero*. *Id.* at ¶¶18-20. The fetal heart monitoring remained reassuring for several hours into the afternoon as Mrs. Cooper's cervix continued to dilate. *Id.* at ¶¶21-28.

At approximately 3:49 p.m. on July 8, 2014, Mrs. Cooper was fully dilated. *Id.* at ¶40. At that time, with the commencement of pushing, the fetal heart rate tracing began exhibiting repetitive late decelerations and minimal variability, which are non-reassuring signs and are indicative of a baby who is becoming stressed and asphyxiated *in utero*. *Id.* at ¶40. During that same time, Mrs. Cooper also exhibited maternal fever and maternal tachycardia, which are signs of chorioamnionitis, an infection of the amniotic fluid, which went untreated for an extended period. *Id.* at ¶49. At the order of Dr. Contreras, Kathleen Windsor, R.N., continued to push with Mrs. Cooper and continued to administer oxygen and employ other intrauterine resuscitative measures in an attempt to improve the lack of fetal oxygenation, however, the fetal heart tracings continued to show recurrent late decelerations, minimal to absent variability, and fetal tachycardia for several hours. *Id.* at ¶¶51-55. Despite these ominous findings of fetal distress, Dr. Contreras continually issued no new orders, as documented by Nurse Windsor. *Id.*

At 7:20 p.m., after more than three (3) hours of consistent recurrent late decelerations, fetal tachycardia, and minimal to absent variability, Dr. Contreras finally ordered a cesarean section delivery. *Id.* at ¶58. According to the Intraoperative Record, the cesarean section decision time was 7:20 p.m., Mrs. Cooper was in the operating room at 7:37 p.m., a time-out was performed at

7:50 p.m. and the uterine incision was made at 7:55 p.m. – this is more than the "thirty-minute decision to incision time" generally endorsed by obstetricians. *Id.* at ¶59.

C.C. was born via cesarean section at 7:59 p.m. on July 8, 2014. *Id.* at ¶61. At birth, C.C. was floppy, apneic, blue, and bradycardic with a heart rate of 50 to 60 beats per minute. *Id.* Her Apgar scores were 2, 2, and 3 at one, five and ten minutes, respectively. *Id.* Initial blood gases in the NICU, after resuscitation, showed profound metabolic acidosis with a pH of less than 6.82 (which was below the labs reportable reference range). *Id.* C.C. was diagnosed with "profound metabolic acidosis" and was started on a "cooling protocol" after consultation with the NICU at Children's National Medical Center (hereinafter referred to as "CNMC") in Washington, D.C., where she was ultimately transferred. *Id.* at ¶62. At CNMC, C.C. underwent hypothermia treatment and a post-cooling MRI showed cerebral, cerebellar, and brainstem hyperperfusion, cortical atrophy, and other severe damage to her young brain. *Id.* at ¶63.

As a result of her brain injuries, C.C. suffers from severe developmental delays, among other injuries and damages. *Id.* at ¶64. Had the Defendants complied with the applicable standards of care, appropriately treated Mrs. Cooper, and timely delivered C.C. via cesarean section, C.C. would be a normal, healthy young girl today. *Id.* at ¶65.

## II.   ARGUMENT[1]

### A. THE DEFENDANTS MUST BE PRECLUDED FROM ARGUING THAT THE PLAINTIFFS WERE CONTRIBUTORILY NEGLIGENT BECAUSE NO DISCOVERY OR TESTIMONY HAS BEEN PRODUCED REGARDING CONTRIBUTORY NEGLIGENCE.

Although a defendant health care provider may raise, in a medical malpractice case, any of the affirmative defenses generally available in any negligence action, including contributory

---

[1] The *Erie* doctrine applies to this case. The basic philosophy of the *Erie* doctrine is that a federal court exercising its diversity jurisdiction to adjudicate rights created by the state sits as another court of the state and should reach the same result as the state court would reach in deciding the identical issue, but the doctrine does not extend to matters of jurisdiction or, generally, to matters of procedure. *Markham v. City of Newport News*, 292 F.2d 711 (4th Cir. 1961).

negligence, that defense may not be invoked unless there is some evidence that the injured party acted, or failed to act, with knowledge and appreciation, either actual or imputed, of the danger of injury which his conduct involves. *Barbosa v. Osbourne*, 237 Md. App. 1, 9, *cert. denied*, 460 Md. 20 (2018). Moreover, under Maryland substantive statutory law, "[i]n an action on behalf of an infant to recover for death, personal injury, or property damage the negligence of the parent or custodian of the infant may not be imputed to the infant." *See* Md. Code Ann., Cts. & Jud. Proc. § 10-910; *see also Matthews v. Amberwood Assocs. Ltd. P'ship, Inc.*, 351 Md. 544, 579 (1998).

Here, the Defendants have not raised a claim of contributory negligence against any of the Plaintiffs. In response to an interrogatory regarding any claim of contributory negligence, both Defendants stated:

> Defendant contends that it, its agents and employees complied with the applicable standards of care at all times. Defendant further contends that the injuries, damages, and/or losses complained of by the Plaintiff in her Complaint were not causally related to any negligent acts or omissions of this Defendant or any of its agents or employees, including but not limited to Erica Contreras, M.D. In support for its contention, Plaintiff are [sic] referred to the medical records and the testimony of its expert witnesses.
>
> Defendant will contend that the injuries, losses, and/or damage claimed by the Plaintiffs in this action resulted in whole or in part from a sickness, condition, activity, injury or other factor unrelated to the negligence alleged in the Complaint. Defendant will also reserve the right to contend that Plaintiff had conditions pre-existing, genetic, or otherwise that contributed to and/or caused their injuries. Given that Defendant's investigation of this matter is still in the early stages, Defendant reserves the right to supplement or amend this Answer.

*See* University of Maryland Charles Regional Health, Inc.'s Answers to Interrogatories, attached hereto as **Pl.'s Ex. 1**; *see also* University of Maryland Community Medical Group, Inc.'s Answers to Interrogatories, attached hereto as **Pl.'s Ex. 2**. The Defendants' discovery responses were never supplemented to add a claim for contributory negligence. None of the Defendants' experts have testified that the Plaintiffs were in any way contributorily negligent or that any alleged contributory

4

negligence caused C.C.'s injuries. Likewise, because the Plaintiffs seek to recover for personal injury to C.C., any alleged negligence of the parents cannot be imputed onto C.C. under §10-910 of the Courts and Judicial Proceedings Article, cited *supra*. The Defendants must therefore be precluded from arguing or offering evidence that the Plaintiffs were in any way contributorily negligent or that any alleged contributory negligence caused C.C.'s injuries.

### B. THE DEFENDANTS MUST BE PRECLUDED FROM OFFERING OR MENTIONING ANY COLLATERAL SOURCES INCLUDING HEALTH INSURANCE, LONG AND SHORT TERM DISABILITY, SSDI, AND HELP FROM FAMILY MEMBERS.

Maryland Courts have recognized the collateral source rule for more than 115 years. *See Norfolk S. Ry. Corp v. Tiller*, 179 Md. App. 318, 327 (2008) (noting recognition of the collateral source doctrine since at least 1899). It is well-established that the collateral source rule excludes evidence of a plaintiff's health insurance coverage to be sure that a defendant tortfeasor pays the full amount of damages, even if the injured party's expenses have been paid by a third party (such as a health insurer), leaving the issue of their final distribution to the laws of subrogation. *Abrishamian v. Barbely*, 188 Md. App. 334, 345-46 (2009) (citing *Narayen v. Bailey,* 130 Md. App. 458, (2000) (defendant prohibited from introducing evidence that the plaintiff has or will recover medical expenses from sources unrelated to the tortfeasor, such as a private insurer, government insurance (Medicare and Medicaid), and the like). Collateral source evidence is substantively inadmissible, and Maryland's courts generally prohibit the slightest reference to any form of health insurance or other collateral forms of reimbursement in front of a jury because it may prejudice the issue of damages. *Abrishamian*, 188 Md. App. at 345-46.

The Maryland Civil Pattern Jury Instructions address the Collateral Source Doctrine and indicate as follows:

> In arriving at the amount of damages to be awarded for past and future medical expenses and past loss of earnings, you may not

5

> reduce the amount of your award because you believe or infer that the plaintiff has received or will receive reimbursement for or payment of proven medical expenses or lost earnings from persons or entities other than the defendant, such as, for example, sick leave paid by the plaintiff's employer or medical expenses paid by plaintiff's health insurer.

MPJI-Cv 10:8 (2017). The rationale for collateral source rules adopted by most federal and state courts is that the culpable defendants should bear the responsibility for damages it caused and that the tortfeasors should not receive the benefit of collateral sources that for whatever reason might be available for the plaintiff.

The Maryland Court of Appeals has stated that "[a] claimant who has received benefits from a third person may nevertheless recover the same amount as part of his damages owed by the tortfeasor because the wrongdoer cannot escape responsibility for the full consequences of his wrong." *Blocker v. Sterling*, 251 Md. 55, 57 (1968). The fact that a plaintiff may receive free care (*i.e.*, family assistance) from a collateral source is no defense to an action for damages against the person causing the injury. *Sainsbury v. Pa. Greyhound Lines*, 183 F. 2d 548, 550 (4th Cir. 1950); *see also Standard Oil Co. of Cal. v. U.S.*, 153 F. 2d 958, 963 (9th Cir. 1946), *affirmed* 322 U.S. 301; *Kenney v. Liston*, 233 W.Va. 620, 626 (2014) (A tort victim who has incurred medical expenses, suffered lost wages, or experienced other compensable loss, may sue the tortfeasor for the entire amount of the victim's injuries even if those losses have been neutralized by first-party insurance, by the victim's relatives, by the victim's employer, or through the kindness of strangers). Any such evidence is improper because it could be misused by a jury to reduce an award by leading the jury to believe that the plaintiff is not in as bad of dire financial straits as might have otherwise seemed. *Norfolk Southern*, 179 Md. App. at 343.

Any evidence, argument and, or, testimony regarding financial assistance from health insurance, short-term disability insurance, long-term disability insurance, social security disability

income, Medicaid, or any applications therefor, and any items or services paid for therefrom, would prejudice the Plaintiffs' damages claims and would be a clear violation of the collateral source rule. Allowing the Defendants to reference these collateral sources would allow the jury to infer that the Plaintiffs have received or will receive reimbursement for or payment of proven medical expenses or lost earnings from persons or entities other than the Defendants. *See* MPJI-Cv 10:8 (2017). It is therefore substantively inadmissible and the Plaintiffs respectfully requests that this Honorable Court preclude the Defendants from making any reference to these sources at trial. Any reference to these sources should also be redacted from the medical records and any and all defense reports.

Likewise, any evidence, argument, or testimony regarding assistive care from the Plaintiffs' family members or friends should be precluded. The Plaintiffs' family is doing what they deem is necessary to provide for C.C. Simply because C.C. is fortunate enough to currently have relatives that, through both necessity and the kindness of their hearts, provide assistance, does not give the Defendants' experts the right to rely on this care to undercut the Plaintiffs' life care plan. This would allow the jury to offset C.C.'s potential damages by the fact that her generous family provides care and assistance. Allowing such would be unfairly prejudicial to C.C.'s damages claim and in direct conflict with well-established Maryland law.

### C. THE COURT SHOULD LIMIT THE NUMBER OF DEFENSE STRIKES AND CHALLENGES TO JURORS BECAUSE THE DEFENDANTS' INTERESTS ARE NOT ADVERSE.

In civil cases, each party shall be entitled to three peremptory challenges. Several defendants or several plaintiffs may be considered as a single party for the purposes of making challenges, or the court may allow additional peremptory challenges and permit them to be exercised separately or jointly.

28 U.S.C.A. §1870.

In the case *sub judice*, the Plaintiffs allege that all Defendants breached the same standards of care. *See* Complaint ¶¶ 68-69. All Defendants, consequently, have the same common interest

in persuading the jury that their actions did not fall below the applicable standards of care while treating Mrs. Cooper and C.C.  The Defendants are sharing the same attorneys and the same expert witnesses which shows that their interests are common.  Furthermore, none of the Defendants have any adverse or hostile interests as all Defendants are owned by University of Maryland Medical System and rely upon the same common defenses.  No one is pointing the finger at the other.  Without the existence of any adverse or hostile interests, this Court should not allow more than the amount of peremptory strikes available under 28 U.S.C.A. §1870.

### D. THE DEFENDANTS MUST BE PRECLUDED FROM REFERENCING LITERATURE IN SUPPORT OF THEIR EXPERT OPINIONS THAT WAS NOT PRODUCED DURING DISCOVERY.

The Advisory Committee Notes to Federal Rule of Civil Procedure 26 make clear that the goal of discovery is the disclosure of relevant information:

> The purpose of discovery is to provide a mechanism for making relevant information available to the litigants. "Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation." *Hickman v. Taylor*, 329 U.S. 495, 507 (1947). Thus the spirit of the rules is violated when advocates attempt to use discovery tools as tactical weapons rather than to expose the facts and illuminate the issues by overuse of discovery or unnecessary use of defensive weapons or evasive responses.

*Id.*  As the Supreme Court has held, mutual knowledge of all relevant facts is critical for proper litigation of a case.  *See Hickman*, 329 U.S.at 507.

Here, the Plaintiff requested any and all medical literature, medical texts, and, or, medical treatises that the Defendants' experts intend to rely upon at their depositions and, or, during direct examination at trial.  Neither Defendant produced any such medical literature and stated:

> Objection.  This Request seeks information that is protected by the attorney-client relationship or attorney work product privileges, or prepared in anticipation of litigation or express request of counsel.  Should Defendant's experts intend to rely upon any medical articles, medical treatises, and/or medical texts that are not privileged, any such literature will be provided after defense experts have been identified in accordance with the scheduling order.

8

*See* University of Maryland Charles Regional Health, Inc.'s Responses to Plaintiffs' Request for Production of Documents, attached hereto as **Pl.'s Ex. 3**; *see also* University of Maryland Community Medical Group, Inc.'s Responses to Plaintiff's Request for Production of Documents, attached hereto as **Pl.'s Ex. 4**. No literature has since been produced by the Defendants aside from a single article referenced by Dr. Contreras at her deposition, entitled Management of Intrapartum Fetal Heart Rate Tracings, which was published by the American College of Obstetricians and Gynecologists in November 2010. Two defense experts mentioned specific pieces of literature in their Rule 26(a)(2)(B) reports but never produced any of the literature referenced. The Defendants' neonatology expert, Jill L. Maron, M.D., had a single citation in her report to an article by Zhao, et al. titled "Effect of Intrauterine Infection on Brain Development and Injury" which was published in 2013. The Defendants' neurology expert, Mark S. Scher, M.D., had a list of references at the end of his report. The Plaintiffs have no objection to the article referenced by Dr. Contreras at her deposition or to the articles referenced by Dr. Maron and Dr. Scher in their reports as the specific reasons for their references to those articles was disclosed. The Defendants and their witnesses must be precluded from referencing any other literature at the time of trial, however.

      Any facts, evidence, or opinions not disclosed in discovery would, if offered at trial, certainly take the Plaintiffs by surprise, and would unfairly prejudice the presentation of Plaintiff's case to the jury. First, the disclosure violation was substantial because the Plaintiffs have never had an opportunity to review the literature which the experts intend to rely upon. Second, the timing of the ultimate disclosure weighs in favor of preclusion as there has still been no disclosure of any medical literature despite the fact that discovery is now closed. The reason, if any, for the violation has not been provided. Finally, the degree of prejudice to the parties respectively offering

and opposing the evidence is stark.  The Plaintiffs will be deprived of any opportunity to review or depose the experts on their medical literature while the Defendants will have the opportunity to prepare their experts for trial based on the undisclosed literature.  The Defendants did not supplement their discovery to advise the Plaintiffs of any such modifications.  The Plaintiffs respectfully requests that the defense experts be precluded from relying on any medical literature that was not specifically disclosed during the course of discovery.

### E. THE DEFENDANTS MUST BE PRECLUDED FROM OFFERING OR MENTIONING THE LACK OF GENETIC TESTING OF C.C. AND THE LACK OF IQ TESTING OF LEIGHARA COOPER AND TRAVIS COOPER.

Speculative testimony must be excluded as incompetent.  *See Tyger Constr. Co. v. Pensacola Constr. Co.*, 29 F.3d 137, 142 (4th Cir. 1994).  Testimony, particularly expert medical testimony, must be sufficiently definite and certain to be admissible, because neither the Courts nor the juries are justified in inferring the existence of facts from mere possibilities, and they cannot make mere conjecture or speculation the foundation of their verdicts.  *See id*.

In the case *sub judice*, there was no prior genetic testing performed on C.C., Leighara Cooper, or Travis Cooper.  Although there has been extensive IQ testing of C.C., there has been no prior IQ testing performed on Leighara Cooper or Travis Cooper.  The Defendants and their experts cannot argue or testify about the lack of genetic and IQ testing and what any such tests "may" have shown because those arguments and testimony would be entirely speculative.  Moreover, none of the Defendants' experts have opined that the genetic testing of C.C. or her parents or the IQ testing of Leighara and Travis Cooper was indicated in this case or that there was any causal connection between such testing and C.C.'s injuries.  As such, any arguments, statements, or testimony regarding the lack of genetic and IQ testing and what any such tests "may" have shown is speculative and must be excluded as incompetent evidence.

### III.     CONCLUSION

For the foregoing reasons, the Plaintiffs move this Court to grant the Plaintiff's *Omnibus Motion In Limine*.

WAIS, VOGELSTEIN, FORMAN & OFFUTT, LLC


/s/ Mary McNamara Koch
Mary McNamara Koch, Esquire
Bar No. 26591
Kieran Murphy, Esquire
Bar No. 20718
1829 Reisterstown Road
Suite 425
Baltimore, Maryland 21208
Telephone: (410) 998-3600
Facsimile: (410) 998-3680
mary@malpracticeteam.com
kieran@malpracticeteam.com
*Attorneys for the Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 31st day of August, 2020, a copy of the foregoing was electronically served upon

Ronald Shaw, Esquire
Thomas Morrow, Esquire
Michael Damiano, Esquire
Shaw & Morrow, P.A.
Executive Plaza III, Suite 1200
11350 McCormick Road
Hunt Valley, MD 21031
*Counsel for Defendants*
*University of Maryland Charles Regional Health, Inc. and*
*University of Maryland Community Medical Group, Inc.*

/s/ Mary McNamara Koch
Mary McNamara Koch, Esquire